875 F.2d 1285
 57 USLW 2731, 10 Employee Benefits Ca 2617
 BANNER INDUSTRIES, INC., Plaintiff
Counterdefendant-Appellant, Cross-Appellee,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and its present Trustees in their capacity as
Trustees, et al., Defendants
Counterplaintiffs-Appellees,
Cross-Appellants,
and
Pepsico, Inc., et al., Defendants.
 Nos. 87-1700, 87-1959, 87-1960 and 87-2794.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 7, 1988.
Decided May 23, 1989.
Rehearing and Rehearing In Banc Denied July 20, 1989.
 
 Thomas D. Yannucci, Kirkland & Ellis, Washington, D.C., for plaintiff counterdefendant-appellant, cross-appellee.
 Rodney F. Page, Arent Fox Kintner Plotkin & Kahn, Peter H. Gould, Pension Benefit Guar. Corp., Office of General Counsel, Washington, D.C., for defendants counterplaintiffs-appellees, cross-appellants.
 Before FLAUM, MANION and KANNE, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Banner Industries, Inc. (Banner) brought this action against Central States, Southeast and Southwest Areas Pension Fund (Central States), among others. Banner sought a declaration that it not be liable for any portion of a demand for withdrawal liability made upon Banner by Central States pursuant to the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. Sec. 1382 (MPPAA). Withdrawal liability is the amount owed a pension plan by an employer which reduces or ceases its plan contributions. Central States moved to dismiss and moved for summary judgment on its counterclaim for interim payments.
 
 
 2
 The two questions certified on appeal are (1) whether a control group employer remains subject to MPPAA arbitration requirements when that corporation has divested itself of its subsidiary before the subsidiary's withdrawal; and (2) whether (assuming arbitration is required) Banner's filing in federal court raising the issue whether under these circumstances a party is subject to the MPPAA mandatory arbitration procedures, tolls the time period for initiating arbitration, 663 F.Supp. 1290. For the reasons stated below, we answer both in the affirmative, and affirm the district court's dismissal of Banner's action and grant of summary judgment for Central States on its counterclaim.
 
 I. FACTS
 
 3
 For purposes of a motion to dismiss, this court accepts a plaintiff's well-pleaded allegations as true. Repp v. F.E.L. Publications, Ltd., 688 F.2d 441 (7th Cir.1982). The facts of this case are alleged as follows. Before March 1983, Commercial was a wholly-owned subsidiary of Banner engaging in interstate trucking. The International Brotherhood of Teamsters represented the majority of Commercial's hourly employees. Commercial contributed to various multiemployer pension plans (principally Central States) pursuant to collective bargaining agreements with the Teamsters.
 
 
 4
 During 1982 Banner hired a consultant for advice on reversing losses suffered by Commercial. This consultant recommended a 20 percent reduction in wages, salaries, and benefits of all Commercial's employees. In return for such reductions, the consultant suggested that majority control of Commercial be transferred to the employees through an Employee Stock Ownership Program (ESOP). Commercial presented the Commercial Lovelace Compensation Program to its employees in February 1983. Under this proposed program, Commercial's employees would absorb wage and benefit reductions of approximately 20 percent of total compensation and benefits. In exchange, Commercial and Banner would establish an ESOP Trust and transfer to it 50.01 percent of the issued and outstanding shares of Commercial stock. Nearly 90 percent of Commercial's employees signed up for the Program. Commercial, on February 20, 1983, announced that the Program would be launched in March 1983.
 
 
 5
 Commercial transferred 4,001,000 shares of its common stock, representing 50.01 percent of Commercial's issued and outstanding shares as of that date, to the ESOP Trust effective March 1, 1983. Banner thereby became a minority shareholder in Commercial and no longer controlled Commercial's operations. After the Program was implemented, Commercial continued making payments to Central States pursuant to its obligations under collective bargaining agreements with the Teamsters.
 
 
 6
 During July 1983, Banner sold 790,000 shares of Commercial stock to CL Investors, a partnership consisting of certain Commercial officers and directors. This reduced Banner's ownership in Commercial to approximately 40 percent. In February 1985, Banner sold another 400,000 shares of Commercial stock to Gerard W. McIntyre, the president of Commercial, thus reducing Banner's ownership in Commercial to approximately 35 percent. In June 1985, Banner sold its remaining 2,809,000 shares of Commercial stock to McIntyre.
 
 
 7
 In April of 1984, Commercial opened negotiations with Pepsico to purchase all of the stock of its wholly owned subsidiary, Leeway Motor Freight, Inc. Leeway engaged in the transportation of goods in interstate commerce. Leeway's collective bargaining agreements required it to contribute to Central States. But for the fiscal year ending December 31, 1983, Leeway had a pretax loss of approximately $24 million on revenues of $170 million. For the five-year period between 1979 through 1983, its aggregate losses from operations totaled almost $75 million. Through the initial three months of 1984, Leeway's operating losses reached approximately $6.6 million. On June 2, 1984, Commercial's board of directors voted five to two in favor of the Leeway acquisition. The two directors voting against that acquisition were officers of Banner who had been named to the board by Banner. As it turned out, the rest of the board should have listened to the dissenters.
 
 
 8
 Pepsico and Commercial executed a Stock Purchase Agreement under which Commercial agreed to pay $500,000 cash and turn over to Pepsico $7.5 million from the sale of Leeway equipment to a third party in return for all of the issued and outstanding shares of Leeway. Additionally, Commercial and Pepsico agreed that immediately before closing the sale Leeway would transfer (in the form of a dividend) certain parcels of real property to Pepsico, which then would be leased back to Leeway. Hence, the acquisition of Leeway by Commercial was financed primarily by the sale or transfer of Leeway assets, with the proceeds or the assets themselves returning to Pepsico. Leeway's operations after Commercial's purchase were initially financed through a working capital loan arranged by Pepsico by a factoring of receivables. But it was necessary to liquidate additional assets, and some of Leeway's post-acquisition asset sales were made to Pepsico; proceeds of other sales were transferred to Pepsico.
 
 
 9
 Throughout the second half of 1984 Leeway sustained heavy losses. Its operations had been largely or completely terminated by December 1984. The Leeway acquisition adversely affected Commercial. Commercial's overhead and expenses increased significantly due to the Leeway personnel absorbed by Commercial when operations were consolidated. Commercial itself lost $2.9 million in the six months from July 1, 1984, to December 31, 1984; it lost $1.1 million in December 1984 alone. Before the acquisition of Leeway, Commercial had been a viable company with positive cash flow and improving operating ratio. But the effort to absorb Leeway drained Commercial's cash reserves and caused Commercial to suffer ballooning losses. It was clear by February 1985 that Commercial could not survive.
 
 
 10
 In March 1985, Commercial had ceased operations and withdrawn from the pension fund. Following an employer's withdrawal from a multiemployer pension plan, that plan's sponsor must determine the amount of withdrawal liability owed, notify the employer of that amount, and demand payment. 29 U.S.C. Secs. 1382, 1399(b)(1); Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208, 210 (7th Cir.1989). Central States claims that Commercial owes $19,808,781.43 for pension withdrawal liability pursuant to the MPPAA. On March 25, 1986, Central States demanded that Banner pay Commercial's withdrawal liability based on its determination that "a principal purpose" of Banner in divesting itself of Commercial was to "evade or avoid" withdrawal liability within the meaning of 29 U.S.C. Sec. 1392(c).[1] Under the MPPAA and its arbitration provision, 29 U.S.C. Sec. 1401(a), that determination is arbitrable.[2]
 
 
 11
 On May 1, 1986, Banner filed a complaint in the district court seeking a declaratory judgment that it ceased to be an "employer" under Sec. 1401(a) as of March 1983, and therefore was not subject to arbitration, and, more important, that it was not responsible for Commercial's withdrawal liability. On August 1, 1986, Central States moved to dismiss Banner's complaint. Central States contended that Banner's claim that it was no longer an "employer" was arbitrable, but that Banner had waived arbitration--and thus could not defend against Central States' demand--by seeking a declaratory judgment as to its status as an employer instead of timely commencing arbitration.Banner's Claims.
 
 
 12
 Banner's position has been that before a district court can order Banner to make interim payments and to proceed to arbitration, it must first determine whether Banner was an employer at the time of the withdrawal. The MPPAA provides that an employer may be assessed with withdrawal liability, and that only an "employer" can be required to make interim payments and go to arbitration. Because the MPPAA only applies to employers' withdrawals from multiemployer plans, its dispute resolution or interim payments provisions likewise apply only to employers.
 
 
 13
 Banner acknowledges that it was an MPPAA employer before March 1983 solely by virtue of the MPPAA's provisions that label it a control group due to Banner's ownership of 100 percent of Commercial's stock. Banner insists that it ceased being an employer after March 1983 when its control of Commercial was severed. By contrast, Banner claims that there is no question that Commercial was an "employer," both before and after the 1983 ESOP, and that Banner never has had any collective bargaining relationship with the Teamsters generating any contractual obligation to contribute to Central States. Thus Banner maintains that it never has been a direct MPPAA employer.
 
 
 14
 Banner acknowledges that it could be held liable as an employer for the withdrawal if Central States' allegations of fraud were proved. But it asserts that disputes over employer status are not arbitrable. Under Banner's theory, when a pension plan seeks to impose liability upon a party other than the contributing employer, it is for the court (not an arbitrator) to determine in the first instance whether that party shares liability with the contributing employer.
 
 
 15
 Banner's concern is that a party that undeniably severed its control group status with a contributing employer might find itself a decade later forced to make interim payments to a plan to which it never had contributed, and further find itself required to prove in an arbitration proceeding that a pension plan's allegations of sham are unreasonable or clearly erroneous. Banner maintains that the MPPAA's interim payment determination that a party be assessed withdrawal liability not only is made on an ex parte basis, but this ex parte decision is made by inherently biased private parties: the pension plan's trustees. Also, since the MPPAA provides that the decision of the pension fund's trustees are presumed correct in arbitration, Banner could never receive an impartial review of the legal determination.
 
 
 16
 Central States' Claims.
 
 
 17
 Since this is a withdrawal liability claim, Central States focuses on the MPPAA provision which provides that any covered dispute between an employer and a plan sponsor shall be resolved by arbitration. Central States claims that when an employer has withdrawn from a multiemployer pension plan, that plan's trustees must ascertain the amount of the employer's withdrawal liability, notify the employer, and demand payment.
 
 
 18
 Central States calls Banner's characterization of this dispute (about whether Banner is an "employer") misleading. As Central States sees it, this suit hinges upon Banner's challenge to Central States' conclusion that the main reason Banner caused Commercial to engage in the ESOP transaction was to evade or avoid withdrawal liability. Thanks to the ESOP ploy, Banner was not an employer at the time of the 1984 assessment; this was Banner's shield. But under the MPPAA, Central States' determination that a principal aim of the ESOP transaction was to evade or avoid withdrawal liability required Central States to pierce that shield. According to Central States, Banner used the ESOP transaction as a ploy in order to "evade or avoid" withdrawal liability by attempting to discard its employer identity at the time of the 1984 assessment. Central States insists that Banner is still an employer and the dispute on withdrawal liability must be arbitrated.
 
 
 19
 Central States chides Banner for citing no precedent of its hypothetical of an employer which legitimately had severed its control group status a decade earlier and then was compelled to make interim payments and submit to arbitration. But Central States points out that were Banner's position accepted, employers confronting substantial withdrawal liability through troubled subsidiaries would engage in transactions with the principal aim of avoiding withdrawal liability, after being assured that pension plans cannot prevail against them unless the plans can prove fraud in a federal court. Central States maintains that Congress intended no such thing in enacting the MPPAA.
 
 
 20
 Thus Central States concludes that Banner is an employer, but because it did not submit to arbitration within the specified time, it has waived the right and must pay the full amount of the withdrawal liability.
 
 II. DISTRICT COURT OPINION
 
 21
 In a comprehensive and well-reasoned opinion, Judge Plunkett referred Banner's demand to arbitration and ordered Banner to make monthly "interim payments" pending arbitration. The court rejected Central States' contention that Banner had waived arbitration because Banner had not raised the arbitrator's jurisdiction issue until the district court proceedings. Banner Industries, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 657 F.Supp. 875 (N.D.Ill.1987) ("Banner I ").[3]
 
 
 22
 Judge Plunkett recognized that Congress enacted the Employee Retirement Income Security Act in 1974 to guarantee that employees who had been promised certain benefits upon their retirement actually received them. Congress amended the statute in 1980 to resolve special problems arising when individual employers terminate their participation in, or withdrawal from, multiemployer plans. Employer withdrawals diminish each plan's contribution base. This pushes the contribution rate for the remaining employers to increasingly high levels to fund past service liabilities, including liabilities created by employers no longer participating in the plan (so-called inherited liabilities). These mounting costs can force further withdrawals, triggering a vicious downward spiral which can kill the pension plan.
 
 
 23
 The trial court found that Congress' enactment of the MPPAA met this threat by mandating that an employer who either completely terminates or partially reduces its contributions to a multiemployer pension fund pay its proportional share of the plan's unfunded but vested benefit liability at the time of the employer's termination or reduction of contributions. An employer completely withdraws from a multiemployer plan when it either permanently ceases to have an obligation to contribute under that plan, or it permanently ceases all covered operations under the plan.
 
 
 24
 But Judge Plunkett noted that Congress provided that, assuming certain demanding conditions are met, a complete or partial withdrawal need not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party, the seller ceases covered operations or ceases to have an obligation to contribute for such operations. And an employer is not considered to have withdrawn from a plan solely because an employer ceases to exist by reason of a change in corporate structure if the change causes no interruption in employer contributions or obligations to contribute under the plan. It was with this statutory framework in mind that the district court addressed this dispute.
 
 
 25
 The threshold question of which tribunal should hear the matter upon the merits was difficult, as Judge Plunkett saw. The difficulty arises primarily due to the parties' failure to agree upon the real issue: Banner contended to the district court that its "employer" status ceased in March 1983 upon transfer of Banner's majority control of Commercial to the ESOP. Banner supposedly then ceased being a single employer with Commercial for MPPAA liability purposes because it ceased to be under common control with Commercial. Banner further asserted that the question of its "employer" status is for a court to decide because the statute's mandatory arbitration provision applies only to disputes between a plan sponsor and an employer. Id. at 879.
 
 
 26
 Central States denied that the issue before the district court was whether or not Banner was an "employer" for withdrawal liability purposes, because Banner conceded that before March 1983 it had been such a statutory employer. Id. Central States instead characterized the true issue as whether Banner was exempt from withdrawal liability following implementation of the ESOP. Id. at 879-80. Central States asserted that because the ESOP did not meet all statutory requirements Banner was properly assessable for withdrawal liability. Moreover, Central States styled the issue as whether a major aim of the ESOP transaction was to evade withdrawal liability; if so, consistently with the statute the plan still could assess and collect withdrawal liability notwithstanding the ESOP transaction. Resolution of either the Central States exemption question or the Central States evasion question in Central States' favor must entitle Central States to assess liability against Banner. Id. at 880.
 
 
 27
 In holding that the appropriate forum for resolving the "employer" dispute is arbitration, the district court began with the premise that until the date of the transaction in question Banner admittedly was a statutory "employer." Id. at 881. The statutory scheme anticipates that once an entity is an employer it will be considered to have withdrawn when it permanently ceases to have an obligation to contribute under the plan, and will be liable for withdrawal liability unless the employer finds a statutory safe-haven.
 
 
 28
 The district court determined that the question of whether one remains an employer as of a withdrawal date is not identical to the question of whether one ever became an employer for MPPAA purposes. The former question is an arbitrator's issue because its resolution hinges upon applying the MPPAA provisions concerning employer withdrawals specifically assigned by Congress to the arbitrator's purview. Id. at 882. The latter question is one for a court because its resolution decides the arbitrator's authority over a dispute, but it is not the question truly at contest here. Id. The factual controversy here turns more upon Banner's continued employer status, and not upon its "employer" status per se. This continued employer status issue is proper for arbitrator determination. Id. at 883.
 
 
 29
 Central States argued that the district court should enter judgment in Central States' favor for the full amount of the assessment because the statutory time limitations for initiating arbitration had expired. Central States contended that Banner had waived its right to arbitrate the fact or the sum of Banner's withdrawal liability. Id. The statutory time limits are strictly construed so that failure to begin arbitration within those limits does constitute waiver of that option. Id. at 883-84.
 
 
 30
 Yet this strict forfeiture rule is relaxed, as the trial court properly understood, if an employer has taken actions warranting tolling of the statutory deadlines. Id. at 884. Banner's filing of its suit tolled the statutory deadline set forth in Sec. 1401(a)(1). Banner did not simply rest upon its rights. When first notified by Central States of the assessment of withdrawal liability Banner filed its district court complaint well before the period for initiating arbitration had run.
 
 
 31
 Accepting Banner's tolling argument does not permit every employer contesting withdrawal liability to ignore statutory deadlines with impunity merely by styling its challenge as a question for resolution by the court, even when as here such characterization is without merit. Id. In a tolling case like Banner's, Judge Plunkett explained, the issues presented question the arbitrator's authority to bind the parties. When the question is whether one of the parties falls within the arbitrator's jurisdiction, fairness considerations mandate that the deadline for arbitration be tolled until determination is made that the party is subject to mandatory arbitration. The district court recognized that this Banner issue had not been definitively decided previously. Id. at 885.
 
 
 32
 Subsequently, in a decision reported at 663 F.Supp. 1290 (N.D.Ill.1987), the court certified two questions for appeal. Those questions were as follows:
 
 
 33
 1. Whether a corporation which, together with its subsidiary, was admittedly a control group employer under MPPAA and, as such, required by MPPAA to arbitrate any challenges to its withdrawal liability arising from the subsidiary's withdrawal, remains subject to MPPAA's arbitration requirement when that corporation has divested itself of control of the subsidiary prior to the subsidiary's withdrawal.
 
 
 34
 2. Whether, assuming arbitration is required, Banner's filing of a lawsuit in federal court raising the issue whether, under these circumstances, a party is subject to MPPAA's mandatory arbitration procedures, an issue not previously decided by the court of appeals, may toll the time period for initiation of that arbitration.
 
 
 35
 663 F.Supp. at 1291.
 
 
 36
 For the reasons expressed by the district court in its opinion, the answer to both questions if "yes."
 
 III. ANALYSIS
 
 37
 A. Whether Banner was an employer.
 
 
 38
 After the district court's decision, the Third Circuit affirmed a District of Delaware decision discussed by the district court here on pages 880-81 of its opinion. We consider the Third Circuit's opinion in Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241 (3d Cir.1987), to be persuasive authority on the issues raised by these parties. See also ILGWU Nat. Retirement Fund v. Levy Bros. Frocks, 846 F.2d 879, 886 (2d Cir.1988), which observed that several circuits have agreed that an employer can be subject to the arbitration provisions of MPPAA even if it arguably was not obligated to contribute to a multiemployer plan during the relevant period for determining withdrawal liability.
 
 
 39
 Flying Tiger Line, like Banner Industries, also required determining whether a federal district court or an arbitrator should resolve whether an entity is an employer subject to the MPPAA, an issue arising in the "evade or avoid" context of Sec. 1392(c). Flying Tiger Line, 830 F.2d at 1243. In perspective of an excellent and complete overview of the MPPAA, id. at 1243-44, that Third Circuit opinion explained that the District of Delaware had certified the following question for appeal:
 
 
 40
 May a corporation that legitimately believes its status as a MPPAA "employer" is doubtful have that issue resolved by a federal court in a timely declaratory action, wherein the federal district court will determine the legal and factual issues necessary for a determination that the corporation is subject to MPPAA liability and procedures, or must the issue of MPPAA applicability and liability instead be determined by a MPPAA arbitrator?
 
 
 41
 Id. at 1247, quoting The Flying Tiger Line, Inc. v. Central States, Southwest & Southeast Areas Pension Fund, No. 86-304, mem. order p 1 (D.Del. Dec. 4, 1986). The Third Circuit concluded that where the party against which withdrawal liability is asserted surely had been a part of the controlled group of an employer subject to the MPPAA at some juncture, and where the disputed questions fall within the scope of MPPAA provisions which are explicitly designated for arbitration, the statute's dispute resolution machinery must be invoked. Flying Tiger Line, 830 F.2d at 1247.
 
 
 42
 In Flying Tiger Line, Tiger International, Inc. (Tiger) contended that the issue was whether Tiger was an "employer" at the time of a bankrupt's withdrawal from the bankrupt's multiemployer pension plans. Id. at 1247. But the primary dispute between Tiger and the funds was whether a crucial sale by Tiger must be ignored under the MPPAA "evade or avoid" provision. Id. This being the case, the Third Circuit was guided by clear Sec. 1401(a)(1) language: disputes between an employer and the plan sponsor of a multiemployer plan concerning determinations made under Secs. 1381-1399 of that Title should be resolved via arbitration. Id. at 1247-48. Flying Tiger Line, like this case, is an "evade or avoid" case, not an "employer" case. Id. at 1248.[4]
 
 
 43
 Tiger proposed that an alleged employer may bring a declaratory judgment action to have its status determined before such a corporate entity need arbitrate. Id. at 1249. Although no provision of MPPAA specifically defines who resolves issues of the status of a one-time employer, the statutory framework expressly provides that once an entity is an employer it will be deemed to have withdrawn when permanently ceasing to have an obligation to contribute under the plan. 29 U.S.C. Sec. 1383(a). Under Sec. 1381 such an employer is assessed withdrawal liability, unless satisfying the statutory provision relieving it of such liability. Id. at 1250.
 
 
 44
 The Third Circuit approvingly drew upon the excellent legal discussion by the district court in this case to satisfy itself that the question of whether one remains an employer on the date of withdrawal is not identical to the question of whether one ever became an MPPAA employer. The focus of the Flying Tiger Line/Banner Industries controversy is on continued employer status, an inherently different problem from mere "employer" status. Id. at 1250-51. Courts that have resolved employer status questions before arbitration have confronted entities which, unlike those of Flying Tiger Line/Banner Industries, never had been employers subject to the MPPAA, and which therefore legitimately challenged application of the MPPAA dispute resolution process to them. Id. at 1251.
 
 
 45
 Tiger claimed that because its complaint challenged the applicability of the entire MPPAA administrative scheme to its dispute, Tiger could not be compelled to arbitrate the question of arbitral jurisdiction. Id. But the Flying Tiger Line district court had not compelled Tiger to arbitrate a legal question of the arbitrator's jurisdiction, but had considered the statutory issue and decided that the dispute was arbitrable under Sec. 1401. Id. at 1251-52. Here, likewise, the district court considered the statutory issue and decided the dispute must be arbitrated under the MPPAA. The Third Circuit affirmed the district court order staying the first count of Tiger's complaint pending MPPAA arbitration. For the reasons articulated by the Third Circuit in Flying Tiger Line, we affirm the district court here.
 
 
 46
 B. Whether time for initiating arbitration is tolled.
 
 
 47
 Having decided that the issue of employer status is arbitrable, we now must decide whether Banner waived its right to arbitrate by filing first in district court. A statute of limitations may be subject to both waiver and equitable tolling. Zipes v. TWA, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). Because the issue raised by Banner was a difficult one, and because Banner moved decisively to present the issue in court within the statutory time period for arbitration, the district court held that Banner's filing suit in federal court tolled the statutory time frames set out in Sec. 1401(a)(1). "This is not a case in which the party assessed did absolutely nothing, waited until the pension filed a collection against it, and then for the first time tried to assert its defenses in court when it should have proceeded in arbitration. Banner took the immediate and affirmative steps to contest its liability."We will uphold a district court's exercise of its equitable power unless the court has abused its discretion. Cf. Ohio v. Peterson, Lowry, Rall, Barber & Ross, 651 F.2d 687, 693-94 and 693 n. 13 (10th Cir.1981). Under the circumstances of this case, Banner did risk waiving the statute of limitations, and the court could have ruled either way. But under this deferential standard of review, we conclude that the district court did not abuse its discretion in holding that Banner did not waive its defenses to withdrawal liability by first seeking declaratory relief in the district court.
 
 
 48
 Not every imaginable question of statutory construction will toll the period during which arbitration must begin. Certainly the next similarly-situated employer who litigates rather than arbitrates will do so in the face of our opinion here. Litigation under similar circumstances could be considered frivolous, and any hardship suffered by avoiding arbitration would be a "self-inflicted wound." See I.A.M. National Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 426-27 (D.C.Cir.1987).
 
 IV. CONCLUSION
 
 49
 Banner, together with its subsidiary (Commercial), was admittedly an employer under the MPPAA. The MPPAA requires an employer to arbitrate any challenges to its withdrawal liability. When Commercial withdrew, Banner remained subject to that arbitration requirement even though it had divested itself of control of Commercial prior to Commercial's withdrawal. Banner's filing of a lawsuit in federal court questioning whether, under these circumstances, it was subject to MPPAA's mandatory arbitration procedures, tolled the time for initiation of that arbitration. Consequently, the decision of the district court is
 
 
 50
 AFFIRMED.
 
 
 
 [1]
 29 U.S.C. Sec. 1392(c) provides: "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."
 
 
 [2]
 29 U.S.C. Sec. 1401(a) provides: "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration...." (Emphasis added.)
 The term "shall" ordinarily is mandatory and not precatory. Anderson v. Yungkau, 329 U.S. 482, 485, 67 S.Ct. 428, 430, 91 L.Ed. 436 (1947). "Shall" always is imperative where a right or benefit depends on that verb. Allied Fidelity Insurance Co. v. State, 415 So.2d 109, 111 (Fla. 3d D.C.A. 1982). Cf. Stewart v. Chevron Chemical Co., 111 Wash.2d 609, 762 P.2d 1143, 1145 (1988) ("should"--as distinguished from "shall,"--can be discretionary, not obligatory); Cusumano v. Ratchford, 507 F.2d 980, 985 (8th Cir.1974) ("should," not "shall," can be not mandatory but precatory).
 
 
 [3]
 The district court reserved ruling on whether Banner was required to pay all arrearages on the interim payments. Banner Industries, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 657 F.Supp. 875, 885 (N.D.Ill.1987) ("Banner I "). Central States moved for an award of past due interim payments, interest, liquidated damages, and attorney's fees. Banner Industries, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 663 F.Supp. 1292, 1293 (N.D.Ill.1987) ("Banner II "). Central States' motion was granted. Id. at 1300
 
 
 [4]
 The Third Circuit was well aware of how strongly Banner I and Flying Tiger mutually reinforce one another, dropping this footnote:
 Cf. Banner Indus., Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 657 F.Supp. 875, 881-81 (N.D.Ill.1987) ("The issue presented by Banner ... is not whether Banner is an 'employer' as defined by the statute, but rather whether Banner at some point ceased to be an employer by ceasing to possess those characteristics [that] caused it to be deemed an employer--in this case, by divesting itself of a majority of its ownership interest in Commercial in March 1983.") (original emphasis).
 Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1250 n. 14 (3d Cir.1987).