CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs–Appellees,

v.

Burton SLOTKY, Defendant–Appellant.

No. 90–3546.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1991.

Decided Feb. 24, 1992.

Terence G. Craig (argued), Margaret M. Fahrenbach, Catherine R. Fuller, Neal S. Deodhar, Central States, Southeast & Southwest Area Pension Fund, Law Dept., Rosemont, Ill., for plaintiffs-appellees.

John H. Ward (argued), Anthony C. Valiulis, Deborah Schmitt Bussert, Norman B. Newman, Karen K. Litscher, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., for defendant-appellant.

Carol Connor Flowe, John H. Falsey, Nancy Heermans, Raymond M. Forster, Israel Goldwitz (argued), Pension Benefit Guar. Corp., Legal Dept., Washington, D.C., amicus curiae.

Before POSNER and KANNE, Circuit Judges, and ENGEL, Senior Circuit Judge.*

POSNER, Circuit Judge.

A multiemployer pension plan (and its trustees, but we can ignore them) sues in this case to enforce withdrawal liability against an individual. The Multiemployer Pension Plan Amendments to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, require that when an employer withdraws from a multiemployer pension plan governed by ERISA, the plan assess a withdrawal liability against him, 29 U.S.C. § 1396, so that the financial burden of his employees' vested pension benefits will not be shifted to the other employers in the plan and, ultimately, to the Pension Benefit Guaranty Corporation, which insures such benefits. To trigger application of the statute, the pension plan must issue a notice, and a demand for payment, of withdrawal liability to the employer. § 1399(b). If the employer wants to contest the assessment he must first complain informally to the plan within 90 days. § 1399(b)(2)(A). If he obtains no satisfaction from this mandatory conciliation procedure he must initiate arbitration—the method prescribed by the statute for resolving disputes concerning assessments of withdrawal liability—within 60 days after the earlier of either the plan's response to the employer's initial complaint, or 120

---

* Hon. Albert J. Engel, of the Sixth Circuit, sitting by designation.

days after the employer, as part of the conciliation procedure, requests additional information from the plan regarding the assessment. § 1401(a)(1). Should the employer fail to request arbitration within the deadline the amount of withdrawal liability assessed by the plan becomes due and owing and the plan can (as here) sue to collect it. § 1401(b)(1).

Stevens Bedding Warehouse, Inc., of which Burton Slotky, the defendant in this case, had become the sole shareholder, withdrew from its ERISA pension plan on August 22, 1987, five days after filing for bankruptcy under Chapter 11. On September 30, the plan filed a claim against Stevens Bedding in the bankruptcy proceeding for withdrawal liability of (in round numbers) $164,000. On April 15 of the following year the plan mailed Stevens a notice and demand for the same amount. Three days later it filed a new claim in the bankruptcy proceeding, which in the interim had been converted from Chapter 11 to Chapter 7. Stevens received the April 15 mailing on May 3. Stevens did not contest the assessment. Nor did Slotky, although the statute provides that "trades or businesses" under "common control" are a single employer for purposes of withdrawal liability, § 1301(b)(1), and the buildings in which Stevens carried on its business had been leased to it by Slotky. The plan never mailed or otherwise delivered a notice and demand (or a copy of one of the notice and demands it had sent Stevens) to Slotky. But it argues that notice to one trade or business under common control is notice to all and that since Slotky did not initiate arbitration by the statutory deadline the amount that the plan had assessed became due and owing from him. The district court, agreeing, granted summary judgment for the plan and entered judgment for the assessed withdrawal liability, plus interest and other costs allowed by the statute, for a total of more than $224,000. The excess over the withdrawal liability of $164,000 is accounted for by interest, liquidated damages, attorneys' fees, and the usual court costs.

Slotky may never have heard of withdrawal liability or the concept of a commonly controlled group, may never have dreamed that he might be deemed the employer of Stevens' employees and might therefore become personally liable for the corporation's obligations to the multiemployer pension fund, was not told (at least by the pension plan directly)—till too late—that he might have this liability, was denied a trial on whether his leasing of buildings that he owned made him a trade or business, and has lost all opportunity to show that the amount of the assessment is in error. Nevertheless we agree with the district judge that the pension plan was entitled to judgment in the amount of the assessment plus the statutory add-ons such as attorneys' fees. The plan followed the correct procedures, the controlled group provision applies (and this issue was properly resolved on summary judgment), and Slotky has failed to establish a basis for equitable tolling of the deadlines for conciliation and arbitration.

We do not understand either the pension plan or the Pension Benefit Guaranty Corporation (which has filed an amicus brief in support of the judgment) to be arguing that the question whether someone is a member of a controlled group is reserved for arbitration, even though the statute requires that all disputes between the employer and the plan be resolved by arbitration, 29 U.S.C. § 1401(a)(1), including some that might be thought jurisdictional. *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628, 634–35 (4th Cir.1983); cf. *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1251–52 (3d Cir.1987). The requirement presupposes a determination that the dispute is with an "employer." On the theory (urged by no one, we have noted) that only the arbitrator can determine who is an employer, and given the plan's position (which happens to be correct, as we shall see) that notice to one member of a controlled group is notice to all, the plan could have sued the Easter Bunny and when the Bunny complained that he was not a trade or business under common control with Stevens Bedding Warehouse could have replied that the

Bunny had waived the argument by failing to demand arbitration within the statutory deadline. For of course Stevens, never suspecting that the Easter Bunny might be a trade or business under common control with it, would not have forwarded the notice to the Bunny.

██ Anyone who suspects that he might be adjudged a member of a controlled group and therefore subjected to withdrawal liability would be well advised to commence arbitration, so that if a court holds that he is a member of such a group and hence is subject to such liability he won't have waived the issues that are reserved for arbitration, as Slotky (we shall see) did here. *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 129 (3d Cir.1986). And we may assume that if such an arbitration is commenced, the arbitrator can decide the issue of controlled group membership. Israel Goldowitz & Thomas S. Gigot, "The Controlled Group Rule for Purposes of the Withdrawal Liability Provisions of the Employee Retirement Income Security Act," 90 *W.Va.L.Rev.* 773, 793–96 (1988). But the example of the Easter Bunny confirms, what the cases imply, cf. *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc., supra,* 788 F.2d at 129; *Banner Industries, Inc. v. Central States, Southeast & Southwest Areas Pension Fund,* 875 F.2d 1285, 1291, 1293 (7th Cir.1989); *Flying Tiger Line v. Teamsters Pension Trust Fund, supra,* 830 F.2d at 1251–52, that the issue of membership in a controlled group cannot be within *exclusive* arbitral jurisdiction. For then people who had absolutely no reason to believe that they might be deemed members of a controlled group would be foreclosed from litigating the issue in any forum because they had never received notice of their potential liability.

It does not follow that a person can always sit back and wait to be sued for withdrawal liability and take his chances on the court's deciding the issue in his favor. What if the pension plan explicitly notifies the person of his potential liability, rather than notifying another member of the (al-

leged) controlled group? What if, like Slotky but unlike the Easter Bunny, he knows or should know that he might very well be deemed a member of a controlled group? In both cases it can be argued that the statutory policy of encouraging the prompt, nonjudicial resolution of disputes over withdrawal liability requires the alleged member of a controlled group to institute arbitration on penalty of losing all opportunity to contest his membership.

██ But this we need not decide. The courts can resolve some disputes over membership in controlled groups (our Easter Bunny case, for example); the plan appears to concede, whether improvidently or not, that this is one of them; and we do not think that the question whether the district court should stay its hand when the alleged member of a controlled group had notice of the allegation of membership is jurisdictional, so that we must disregard the concession. For purposes of our appellate review, therefore, the question whether Slotky was a member of a controlled group was properly before the district court. The next issue is what kind of question it is, fact or law. It is a question of fact, even though all the "facts" as a layman would perceive them are agreed upon and the only dispute is over characterization, here over whether Slotky's act in leasing buildings to Stevens Bedding made him a "trade or business" (there is no doubt that he and Stevens were under common control within the meaning of the statute). The application of a legal standard to undisputed facts is classified as a fact for purposes of delimiting the respective spheres of trial and appellate court. *United States v. McKinney,* 919 F.2d 405, 419 (7th Cir.1991) (concurring opinion), and cases cited there. We defer to the factfinder's application just as we do to his findings with regard to the facts to which to apply the standard. In either case the appellate standard is clear error.

██ Factual disputes are not supposed to be resolved on summary judgment. The purpose of the summary judgment procedure is to determine whether there is a (material) factual dispute, in which event

there must be a trial. Fed.R.Civ.P. 56. That is the general rule, all right, but it doesn't make much sense in a case in which the only "factual" issue is one of characterization, that is, of application of undisputed lay facts, *and* the opponent of summary judgment claims no right to a jury trial. For then both the record and the factfinder are the same in the summary judgment proceeding as they would be in a trial. There is no more evidence to put in and no different trier to evaluate it. When both these conditions are satisfied, the formally "factual" dispute is properly resolved on summary judgment. *Dimmitt & Owens Financial, Inc. v. United States,* 787 F.2d 1186, 1192 (7th Cir.1986); *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1116 (7th Cir.1986).

■ Properly resolved on summary judgment and also correctly in this case, though Slotky argues that he held the buildings as a mere nominee of Stevens Bedding, equivalent to a trustee. It is commonplace for a person or firm that wishes to be inconspicuous to its creditors to lodge title to its assets in a nominee, who like a trustee holds bare legal title, the nominator being the equitable owner. Ill.Rev.Stat. ch. 17, ¶ 1676; *American National Bank & Trust Co. v. Weyerhaeuser Co.,* 692 F.2d 455, 461, 464 (7th Cir.1982); *United States v. Pittman,* 449 F.2d 623, 625 (7th Cir. 1971). A business firm, and a trust company that held property in trust for the firm, would not be two trades or business under common control, subjecting the trust company to withdrawal liability; and no more if the trust company were a nominee. But our case is remote from these. First, in the usual case of trusteeship or nomineeship the business firm and the trust company will not be under common ownership, so whether the trust company's activity constitutes a trade or business within the meaning of the withdrawal statute (which incidentally doesn't define either "trade" or "business") will be academic. Second, the facts indicate that Slotky was not a true nominee, that is, a holder merely of bare legal title. He didn't for example have Stevens pay income tax on the income of the buildings, as Stevens should have done

if it were the equitable owner. *Helvering v. F. & R. Lazarus & Co.,* 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 437, 69 S.Ct. 726, 734, 93 L.Ed. 779 (1949); G.C.M. 38198 (IRS Dec. 13, 1979); Joel E. Miller, "The Nominee Conundrum: The Live Dummy Is Dead, But the Dead Dummy Should Live!" 34 *Tax L.Rev.* 213, 223 (1979). Slotky collected rent from Stevens, albeit sporadically, and, so far as appears, pocketed it rather than giving it to Stevens as he should have done if he (Slotky) were a mere nominee—a holder of bare legal title—and not the equitable (=real) owner.

■ Third and most important, since almost the entire purpose of the Multiemployer Pension Plan Amendments is to prevent the dissipation of assets required to secure vested pension benefits, the use of a controlled nominee to screen assets from creditors is just the sort of device at which the controlled group provision is aimed. We take it that the purpose of limiting controlled group membership to persons engaged in trades or businesses is to protect the owners of corporations from having to dig into their pockets to make good the withdrawal liability of their corporations. Only if a person owns more than one corporation or other business entity is he in danger—and he must own the corporation in the sense of controlling it; it is not enough that he own some stock in it. 29 C.F.R. § 2612.2; Treas.Reg. § 1.414(c)–2. Slotky, however, wasn't sued merely because he was the sole shareholder of Stevens. That established his control over only one trade or business. He was also the proprietor of a real-estate business that, incidentally but inessentially—for there is no requirement that the trades or business under common control be related, *Board of Trustees v. Lafrenz,* 837 F.2d 892, 895 (9th Cir.1988)—was operated for the benefit of Stevens as well as of himself. *Id.; Board of Trustees v. H.F. Johnson, Inc.,* 830 F.2d 1009, 1013–14 (9th Cir.1987).

Slotky had withdrawal liability and the next question is whether the notice of this liability was adequate, and so started the

countdown for challenges to the amount of that liability. There were two notices—one filed in the bankruptcy proceeding, and another sent later directly to Stevens—and if either was adequate, even the later one, Slotky is out of luck, because he never initiated the dispute resolution process created by the statute.

We, like other courts, have held that notice to one member of a controlled group is notice to all. *Trustees v. Central Transport, Inc.*, 888 F.2d 1161, 1163 (7th Cir.1989), and cases cited there. This rule may *seem* harsh—though we note that Slotky testified not that he had never been informed of his withdrawal liability but that he didn't *remember* whether he had been informed. But it is not, really, even in a case such as this where the member of the controlled group on whom liability comes to rest is an individual. There is no suggestion that Stevens Bedding was unaware that it was a participant in a multiemployer pension plan governed by ERISA, which meant also by the amendments to ERISA, including the Multiemployer Pension Plan Amendments. There is no suggestion that Stevens was unaware that Slotky, being both its sole shareholder and the lessor of its premises, was potentially a member of a group of trades or businesses under common control—a controlled group, in other words. Knowing this, Stevens Bedding acted with shocking insouciance if it failed to notify Slotky that it had received a notice and demand for withdrawal liability, and it is hardly inequitable to visit the consequences of a corporation's negligence on its sole shareholder rather than on other firms, such as the other members of the multiemployer pension fund. And for all we know Stevens Bedding *did* notify its sole shareholder, since, as we said, Slotky just says he doesn't remember having been notified. There is nothing unreasonable about requiring the notified firm to notify the other members of the controlled group rather than requiring the pension plan to thread what may be a maze of intercorporate relations to establish the bounds of the group. It is no harsher than the rules that permit service of process other than just by personal notice, even though all the other means involve agents, if only the agency of the post office.

From all this it should be clear that the requirements of due process are met in this case. We are far from the artificiality of presuming notice from newspaper publication, a presumption rejected in *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 491, 108 S.Ct. 1340, 1348, 99 L.Ed.2d 565 (1988), because direct notice (in the form of personal service) was a feasible alternative in that case. It was less feasible here, and the feasible alternative was more likely to result in the affected party's acquiring the knowledge that he would be assessed withdrawal liability than if his only "notice" had been a statement buried in some newspaper.

Slotky argues that the notice (directly to Stevens, indirectly to him) was defective as to form, because it didn't set forth a schedule of payments of the assessed liability, as the statute requires. 29 U.S.C. § 1399(b)(1)(A)(ii). The notice was directed not at him, however, but at Stevens, a bankrupt, and such a schedule would have been otiose, because the bankruptcy court would inevitably establish its own, supervening schedule for payment of all debts of the bankrupt to all creditors. That is not much of an answer to Slotky's objection, though, since the plan argues (and we agree) that notice to Stevens is notice to Slotky. There must be adequate notice to the latter even if the unfortunate position of the former as a bankrupt makes it less than interested in the details of its liability. But in the end the argument is of no consequence because the schedule of payments was in fact attached to the notice and demand that the plan mailed Stevens.

There is a deeper objection to Slotky's argument concerning the adequacy of the plan's bankruptcy claim as notice under the Multiemployer Pension Plan Amendments. The objection is the second notice and demand to Stevens, the one sent directly, that is, outside the bankruptcy proceeding. That notice makes the bankruptcy filing academic. But we shall soldier on, and

consider for future reference two more arguments by Slotky about the plan's filing in the bankruptcy court: that it violated Bankruptcy Rule 3001(c), which requires that a claim based on a writing be accompanied by the writing, and that it violated the automatic stay in bankruptcy. 11 U.S.C. § 362.

The first argument is no good even if we assume that the pension fund's claim was based on the collective bargaining agreement as well as on the statute, so that Rule 3001(c) applied (maybe). It is no good because a technical violation of the bankruptcy rules would not invalidate the pension fund's filing as effective notice under the Multiemployer Pension Plan Amendments.

As for the automatic stay, there is admittedly an analogy between an outright suit against the bankrupt, which would incontrovertibly violate the stay, § 362(a)(1), and a notice and demand that kicks off a sequence of conciliation and arbitration which may well result in an arbitrator's order—equivalent to, because enforceable by, a legal judgment—against the bankrupt. The analogy may fail, for while the automatic stay probably applies to arbitrations equally with adjudications, *In re T.D.M.A., Inc.*, 66 B.R. 992, 996 (Bankr. E.D.Pa.1986); *In re Cott Corp.*, 26 B.R. 332, 336 (Bankr.D.Conn.1982); H.R.Rep. No. 595, 95th Cong., 1st Sess. 340–42 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6296–6298, an initial demand does not inaugurate a litigation or even create a lien (another act barred by the automatic stay. *In re H & H Beverage Distributors*, 850 F.2d 165, 167 (3d Cir.1988)). But even if the demand violated the automatic stay, all that this would mean, it seems to us, so far as bears on this case (for the violation might of course expose the violator to contempt proceedings, as with any other violation of a judicial order), is that the pension plan could not proceed against Stevens unless the bankruptcy judge lifted the stay. The demand would still be effective against nonbankrupt members of the controlled group, such as Slotky. So at least the cases hold, *I.A.M. National Pension Fund v. Slyman Industries, Inc.*, 901 F.2d 127 (D.C.Cir.1990); *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1065 (4th Cir.1991), sensibly in our view, though there is a division of authority over whether in other settings a filing that violates the automatic stay can be given any legal effect. *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir.1991).

The last question is whether the deadline for arbitration should be deemed equitably tolled, as in *Banner Industries, Inc. v. Central States, Southeast & Southwest Areas Pension Fund, supra,* 875 F.2d at 1293–94, and *Trustees v. Central Transport, Inc., supra.* The deadline for initiating arbitration is a form of statute of limitations and the doctrine of equitable tolling is read into federal statutes of limitations. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir.1991). There are exceptions, *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1391 (7th Cir.1990); *Hardin v. City Title & Escrow Co.*, 797 F.2d 1037 (D.C.Cir.1986), but none is applicable to withdrawal liability and we can think of no reason to create one. That Congress wanted disputes over such liability to be resolved expeditiously—which is why the deadline is short and the prescribed mode of resolution arbitration—is a factor properly to be taken into account in deciding whether to toll the deadline in a particular case rather than a compelling reason to rule it out in all cases. All equitable tolling means is that a person is not required to sue within the statutory period if he cannot in the circumstances reasonably be expected to do so. *Cada v. Baxter Healthcare Corp., supra,* 920 F.2d at 451; *Webb v. Indiana National Bank*, 931 F.2d 434, 436 (7th Cir.1991). We suppose that if Mr. Slotky had had a disabling stroke the day the pension plan gave notice to Stevens Bedding, and it took more than 90 days for his family to find someone to handle his business affairs, he would not have forfeited all right to contest what might be an outlandish assessment.

In *Banner*, the employer responded to the pension plan's notice of withdrawal liability and demand for payment by bringing a suit for a declaration that it was not

liable because it was not an employer within the meaning of the statute. We held that the district judge had not been unreasonable in concluding that the filing of the suit suspended the time for initiating the conciliation and arbitration procedure. In *Central Transport,* the employer was in bankruptcy and the pension plan filed a claim in bankruptcy which the employer contested. We held that the filing of the claim tolled the time for seeking conciliation and arbitration. Both decisions can be questioned, given Congress's evident desire that challenges to withdrawal liability be resolved quickly, given that the employer could pursue his judicial and arbitral remedies simultaneously, as suggested in *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc., supra,* and given, therefore, that it would not have been infeasible for the employer to commence arbitration. These things were true in *Central Transport* even though the employer was in bankruptcy, since the automatic stay does not prevent legal action by as distinct from against the debtor, *Martin–Trigona v. Champion Federal Savings & Loan Ass'n,* 892 F.2d 575 (7th Cir.1989), and since in any event the other members of the alleged controlled group were not in bankruptcy.

The Pension Benefit Guaranty Corporation asks us to reexamine our two decisions in light of these criticisms. But the criticisms are disabling only if the decisions are read broadly; and we read them narrowly. In *Banner,* it was unclear at the time the employer sued that the issue he wanted to present to the district court was arbitrable. The district court thought that in these circumstances he should not be forced to bring two proceedings at once; and we upheld this discretionary determination. In *Central Transport,* the other members of the controlled group had reasonably believed that they could obtain an authoritative determination of their liability in the bankruptcy proceeding. The two cases should probably be regarded as transitional decisions in which uncertainties about the law made judges hesitate to penalize litigants for having made questionable procedural choices. There is nothing like that here. The pension fund filed a claim in the bankruptcy proceeding in order to preserve its rights against Stevens Bedding, and then as was its right proceeded against another member of the controlled group outside of bankruptcy. Slotky neither invoked the statutory procedure for conciliation and arbitration nor sought a judicial declaration that he was not liable because he was not a member of the controlled group. He waited until he was sued—having till then emitted nary a peep to suggest that he was contesting the assessment of withdrawal liability. He thus failed to display due diligence, a precondition of equitable tolling. *Webb v. Indiana National Bank, supra,* 931 F.2d at 436. He who wants equity must do equity.

Slotky raises other issues but only one requires mention, and that briefly—whether interest, liquidated damages, and attorney's fees were properly added to his withdrawal liability on the authority of 29 U.S.C. § 1132(g)(2). These are mandatory add-ons in (successful) suits to enforce section 1145, *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1156 (7th Cir.1989) (en banc), whereas this was a suit to enforce the sections governing withdrawal liability, 1381 and 1399. Another provision, however, 1451, expressly assimilates failures to satisfy withdrawal liability to violations of section 1145. *United Retail & Wholesale Employees Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 134 (3d Cir.1986); *Trustees of Amalgamated Insurance Fund v. Geltman Industries, Inc.,* 784 F.2d 926, 931–32 (9th Cir. 1986).

AFFIRMED.