**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a Pension Trust, Loran W. Robbins, Marion M. Winstead, et al., Plaintiffs–Appellees,**

**v.**

**Jean DITELLO and Angelo Ditello, Defendants–Appellants.**

**No. 91–2072.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1992.

Decided Sept. 8, 1992.

888

Terence G. Craig, Thomas C. Nyhan, Francis J. Carey, Thomas J. Angell, James P. Condon (argued), Central States, Southeast & Southwest Area Pension Fund Law Dept., Rosemont, Ill., for plaintiffs-appellees.

Dennis A. Marks, Donald Gancer, Querry, Harrow, Gulanick & Kennedy, Chicago, Ill., Gregory Gramling, Jr. (argued), Milwaukee, Wis., for defendants-appellants.

Before CUMMINGS, EASTERBROOK and MANION, Circuit Judges.

MANION, Circuit Judge.

Plaintiff-appellee Central States, Southeast and Southwest Areas Pension Fund, a multi-employer pension plan, and its trustees (collectively, "Central States") filed this Employee Retirement Income Security Act action to collect withdrawal liability from Angelo and Jean Ditello. The district court granted summary judgment for Central States, and the Ditellos appeal. We affirm.

## I.

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1368, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461, provides that an employer who ceases contributing to a multiemployer pension plan governed by ERISA is liable for "withdrawal liability," which is his proportionate share of "unfunded vested benefits." 29 U.S.C. § 1381. Withdrawal liability ensures that "the financial burden of his employees' vested pension benefits will not be shifted to the other employers in the plan, and ultimately, to the Pension Benefit Guaranty Corporation, which insures such benefits." *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir.1992).

To collect withdrawal liability under the MPPAA, a pension plan must determine the amount of withdrawal liability owed by a withdrawing employer, 29 U.S.C. §§ 1382, 1391, and send the employer a notice and demand for payment of that amount, 29 U.S.C. § 1399(b)(1). An employer who disagrees with a plan's determination of withdrawal liability may ask the plan to review its assessment, 29 U.S.C. § 1399(b)(2), and if still dissatisfied, may initiate arbitration. 29 U.S.C. § 1401(a)(1). Arbitration of any dispute concerning a plan's determination of withdrawal liability is mandatory. *Id.* If an employer fails to timely initiate arbitration, the amount of withdrawal liability assessed by the plan becomes due and owing, and the plan can sue to collect it. 29 U.S.C. § 1401(b)(1). *See generally, Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1056 (7th Cir.1988).

The withdrawing employer in this case is National Transit Cartage Company, Inc. ("National Transit"). National Transit is a Wisconsin trucking company that, pursuant to a collective bargaining agreement, made

contributions to the Central States Pension Fund. Sometime in 1982, National Transit went out of business and stopped contributing to the pension fund. Central States determined that National Transit completely withdrew from the pension fund on or about December 25, 1982 and assessed over $200,000 in withdrawal liability. As required by the MPPAA, in August 1984, Central States sent a notice and demand for payment of this amount to National Transit. National Transit contested the amount of withdrawal liability, claiming it had withdrawn from the plan before December 25, 1982. Central States and National Transit tried to resolve the dispute informally and entered a stipulation extending National Transit's time to initiate arbitration to August 16, 1988.

On August 16, 1988, National Transit sent a letter requesting arbitration to Central States. But Central States received the letter on August 17, 1988, and National Transit did not notify the American Arbitration Association ("AAA") of its request for arbitration or pay the AAA's fee until September 9, 1988. Contending that this request for arbitration was untimely and, therefore, that the assessed withdrawal liability was due and owing, Central States brought suit against National Transit to collect the withdrawal liability.

## II.

One may inquire why the Ditellos are now the only defendants in this suit. After the district court, pursuant to 29 U.S.C. § 1399(c)(2), ordered National Transit to make interim withdrawal liability payments, National Transit filed bankruptcy and the suit against it was stayed. Instead of waiting in line with the rest of National Transit's creditors, Central States filed suit against the Ditellos—National Transit's sole shareholders. Later, Central States voluntarily dismissed its claims against National Transit.

Central States was able to seek recovery of National Transit's withdrawal liability from the Ditellos by virtue of 29 U.S.C. § 1301(b)(1). "Under 29 U.S.C. § 1301(b)(1), all members of a 'common control' group of 'trades or businesses' are jointly and severally liable for the withdrawal liability incurred by any one member of the controlled group." *Central States, Southeast and Southwest Areas Pension Fund v. Koder*, 969 F.2d 451, 452 (7th Cir.1992) (citing *Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir.1988)). This is sometimes referred to as "control group" liability. The Ditellos own commercial real estate which they lease to National Transit. The district court held that this real estate proprietorship is a trade or business under common control with National Transit, and thus, the Ditellos are liable for National Transit's withdrawal liability. The Ditellos argue that leasing property is not a "trade or business" and that the real estate proprietorship was not under "common control" with National Transit.

### A. *"Trade or Business"*

ERISA does not contain a definition of the term "trade or business." Section 1301(b)(1) provides that the phrase "trades or businesses (whether or not incorporated) which are under common control" has the same meaning as that provided in the regulations promulgated under section 414(c) of the Internal Revenue Code. Unfortunately, those regulations do not define the term "trade or business"; rather, they are concerned only with determining when businesses are commonly controlled. Thus, there is no hint to the meaning of the term "trade or business" in the language of the statute or its regulations.

The Ditellos invite us to apply cases interpreting the term "trade or business" as used in various other Internal Revenue Code sections. The problem with this suggestion is that the term "trade or business" is used throughout the Internal Revenue Code, and "the precise meaning or connotation of the term appears to vary depending upon the provision in which it is used." *Groetzinger v. C.I.R.*, 771 F.2d 269, 271 & n. 4 (7th Cir.1985) (term "trade or business" appears in the tax code at least 170 times, in 60 different sections), *aff'd*, 480

U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987). As one court has stated, "[s]ince the meaning of 'trade or business' varies somewhat from one Code section to another, a suggestion that courts should look anywhere in the Code for guidance is an invitation to mass confusion." *United Food and Commercial Workers Union v. Progressive Supermarkets,* 644 F.Supp. 633, 638 (D.N.J. 1986) (citations omitted). The Ditellos offer no guidance (and neither does our own research) as to which Code section interpretation we should choose and why it would be preferable over others. Thus, we think the wisest course is to abandon the Internal Revenue Code as an interpretive tool.

■ We will instead construe the term "trade or business" in light of the purpose of the MPPAA. The purpose of the MPPAA "is to prevent dissipation of assets required to secure vested pension benefits." *Slotky,* 956 F.2d at 1374. *See also Central States, Southeast and Southwest Areas Pension Fund v. Lloyd L. Sztanyo Trust,* 693 F.Supp. 531, 537 (E.D.Mich. 1988) ("§ 1301(b) utilizes control group liability to prevent businesses from 'juggling their activities to eviscerate the termination liability provisions of ERISA'"); *Pension Benefit Guaranty Corp. v. Center City Motors, Inc.,* 609 F.Supp. 409, 412 (S.D.Cal. 1984) ("When Congress defined all members of a controlled group as a single 'employer,' it clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations."). Leasing property to a withdrawing employer is an economic relationship that could be used to so dissipate or fractionalize assets and thus avoid withdrawal liability. It furthers the purpose of the MPPAA, therefore, to hold that leasing property to a withdrawing employer is a "trade or business." Thus, federal courts reaching this issue, including this circuit, have uniformly held that leasing property to a withdrawing employer is a "trade or business" for purposes of section 1301(b)(1). *See Koder,* 969 F.2d at 453–55; *Slotky,* 956 F.2d at 1374; *Lafrenz,* 837 F.2d at 895; *Trustees of Amalgamated Ins. Fund v. Saltz,* 760 F.Supp. 55, 58 (S.D.N.Y.1991); *Sztanyo Trust,* 693

F.Supp. at 537; *Progressive Supermarkets,* 644 F.Supp. at 639; *Center City,* 609 F.Supp. at 412. We see no reason to depart from this rule.

The more difficult question is whether leasing property to an unrelated third party is a "trade or business" within the meaning of section 1301(b)(1). If, for example, the Ditellos (instead of leasing property to National Transit) had leased the same commercial real estate to a completely separate company, would that be enough to hold them personally responsible for National Transit's withdrawal liability? In this situation, there is no economic relationship which National Transit could use to dissipate its assets and avoid withdrawal liability; thus, it seems, holding the Ditellos liable would not further the purpose of the MPPAA. Nevertheless, there are cases on both sides of this issue. Compare *Textile Workers Pension Fund v. Oltremare,* 764 F.Supp. 287, 289 (S.D.N.Y.1989) (section 1301(b) requires "a solid nexus between the real property and the other trades or businesses within the control group"), with *Lafrenz,* 837 F.2d at 895 ("section 1301(b)(1) does not require that commonly controlled businesses be economically related"), and *Local 478 Trucking and Allied Ind. Pension Fund v. Jayne,* 778 F.Supp. 1289, 1305 (D.N.J.1991) ("no showing of an economic relationship is necessary under 29 U.S.C. § 1301(b)(1)") (citations omitted). Recently, this circuit cited *Lafrenz* with approval, stating "there is no requirement that the trades or business under common control be related." *Slotky,* 956 F.2d at 1374. In *Slotky,* however, as in this case, there was an economic relationship between the leasing business and the withdrawing employer—Slotky owned commercial buildings which he leased to the withdrawing corporation. *Id.* at 1372. Thus, this circuit has never squarely faced the issue of whether businesses must be economically related to be considered members of a controlled group of trades or business under section 1301(b)(1), and it remains an open question.

## B. *"Common Control"*

■ To determine whether the real estate proprietorship is under common con-

trol with National Transit we look to the regulations promulgated under section 414(c) of the Internal Revenue Code. 29 U.S.C. § 1301(b)(1). One category of a controlled group defined by the regulations is the "brother-sister" group. A brother-sister group exists when the same five or fewer individuals own a "controlling interest" in and exercise "effective control" over each entity. 26 C.F.R. § 1.414(c)–2(c). Where the business is a corporation, "controlling interest" is ownership of at least 80% of the total voting power or total value of shares, 26 C.F.R. § 1.414(c)–2(b)(2)(A), and "effective control" is ownership of more than 50% of the total voting power or the total value of shares, 26 C.F.R. § 1.414(c)–2(c)(2)(i). "Controlling interest" in and "effective control" over a sole proprietorship is established by ownership of the proprietorship. 26 C.F.R. §§ 1.414(c)–2(b)(2)(D) & –2(c)(2)(iv).

In 1982, when National Transit withdrew from the pension fund, the Ditellos owned 100% of National Transit and 100% of their real estate proprietorship.[1] They had "controlling interest" in and "effective control" over both entities. Thus, National Transit and the proprietorship fall squarely within the definition of a "brother-sister" controlled group of trades or businesses.

The Ditellos challenge this conclusion by contending that they did not have control over the real estate proprietorship. The proprietorship started as a partnership— the Ditellos had a 50% interest and their partner, David Reszel, had a 50% interest. But in 1979, the Ditellos bought out Reszel. As consideration, the Ditellos gave Reszel a promissory note secured by a second mortgage on the real estate. The Ditellos still owe Reszel a substantial sum, and he still holds a security interest in the property. Because of this, the Ditellos argue, the partnership was not "wound up" and they were not "free to do with the partnership assets as they wish."

But this is both untrue and irrelevant. Ditello and Reszel signed a contract for the sale of Reszel's partnership interest which stated:

> Further, the said partnership shall be deemed dissolved as of November 1, 1979, and upon receipt of all the assets of the partnership by buyer [the Ditellos], there shall be no need for any further accounting or division between the partners by way of a winding up of the partnership affairs....

There was no need to "wind up" the partnership affairs because the business continued after the dissolution of the partnership. *See, e.g. Lange v. Bartlett,* 121 Wis.2d 599, 360 N.W.2d 702, 704 (App.1984) (upon dissolution, a partner "can either force the business to 'wind-up' and take his part of the proceeds ... or he can permit the business to continue and claim as a creditor the value of his interest at dissolution"). Thus, the partnership was completely terminated in 1979—leaving the Ditellos owners of a sole proprietorship with Reszel as a secured creditor. Reszel has no more "control" over the proprietorship than would any other secured creditor. That is, the Ditellos could, without permission from Reszel, sell the proprietorship's assets (or asset, the real estate); but, the Ditellos would either have to assign the two mortgages to the buyer or pay the mortgages with the proceeds from the sale. In any case, whether the Ditellos "control" the proprietorship is determined by their equity interest or voting power in the business. And it is undisputed that they have 100% of both. Reszel, as a creditor, has no equity interest or voting power in the proprietorship. The regulations do not state that the equity owners do not "control" an entity if the entity has creditors; given that most businesses have creditors, such a rule would be unworkable. The existence of a creditor does not negate the Ditellos' "con-

---

**1.** Actually, Angelo Ditello was the sole shareholder of National Transit and owner of the real estate proprietorship. But this is irrelevant because, for purposes of the MPPAA, Angelo's interests in National Transit and the proprietorship are attributable to his wife. 26 C.F.R. § 1.414(c)–4(b)(5)(i); *Lafrenz,* 837 F.2d at 894 ("[a]n interest in an organization is attributed to the owner's spouse to prevent the use of marital property to circumvent federal law"). So, both Angelo and Jean Ditello are deemed to have a 100% interest in both businesses.

trolling interest" in and "effective control" over the real estate proprietorship.

### III.

■ The real estate proprietorship is thus a "trade or business" under "common control" with National Transit; and, through the proprietorship, the Ditellos are jointly liable for National Transit's withdrawal liability. We now turn to the question of National Transit's withdrawal liability. The district court found that National Transit failed to timely initiate arbitration and, pursuant to 29 U.S.C. § 1401(b)(1), is thus liable for the amount of withdrawal liability demanded by Central States. *See Admiral Merchants,* 846 F.2d at 1055 ("the consequence of failure to initiate arbitration is the immediate obligation to pay the sum demanded by the plan sponsor"). On appeal, the Ditellos argue that the request for arbitration was timely.[2]

Section 1401(a)(2) provides that arbitration of withdrawal liability disputes "shall be conducted in accordance with fair and equitable procedures" promulgated by the Pension Benefit Guaranty Corporation ("PBGC"). 29 U.S.C. § 1401(a)(2). The PBGC regulations are codified at 29 C.F.R. § 2641.1 *et seq.* As allowed by the regulations, 29 C.F.R. § 2641.2(b), the parties entered a stipulation extending National Transit's time to initiate arbitration to August 16, 1988. On August 16, 1988, National Transit sent a letter requesting arbitration to Central States, but Central States did not receive the letter until August 17, 1988. National Transit did not notify the American Arbitration Association of its intent to arbitrate (or pay the AAA's fee) until September 9, 1988. The issue here, then, is whether sending the request for arbitration to the pension fund

on August 16th successfully initiated the arbitration.

The PBGC regulations state that the party initiating arbitration "is responsible for establishing that the notice of initiation of arbitration was *received* by the other party within the applicable period...." 29 C.F.R. § 2641.2(c). Giving the other party notice of arbitration is the only requirement under the PBGC rules for initiating arbitration.

The regulations also provide, however, that "an arbitration may be conducted in accordance with an alternative arbitration procedure approved by the PBGC...." 29 C.F.R. § 2641.13. Central States has promulgated the following rule on arbitration of withdrawal liability disputes:

> The commencement of an arbitration proceeding is made by written notice to the withdrawn Employer in question, to the bargaining representative (if any) of the affected employees of the withdrawn Employer, to the Fund and to the Chicago Regional Office of the American Arbitration Association. Such arbitration will be conducted, as much as possible, in accordance with the "Employee Benefit Plan Claims Arbitration Rules" administered by the American Arbitration Association, with the exception of the initial filing fee (which is to be paid by the party initiating the arbitration proceeding).

Thus, Central States has adopted the AAA arbitration rules which, pursuant to 29 C.F.R. § 2641.13(c), have been approved by the PBGC. 50 Fed.Reg. 380,046 (Sept. 19, 1985); 51 Fed.Reg. 22,585 (June 20, 1986). Under the Central States/AAA rules, arbitration is initiated by (1) written notice to

---

**2.** The time for initiating arbitration does not begin to run until the withdrawing employer receives a notice and demand for payment of withdrawal liability. *Slotky,* 956 F.2d at 1375. Central States sent such a notice to the National Transit but not to the Ditellos as individuals. However, "notice to one member of a controlled group is notice to all." *Id.* And, in this case, since the notice to National Transit was actually sent to the Ditellos as National Transit's sole

shareholders, the Ditellos had actual notice of Central States' claim for withdrawal liability against National Transit. Thus, the notice to National Transit was sufficient notice to the Ditellos, and they could only contest Central States' determination of withdrawal liability by timely initiating arbitration. Since the Ditellos, as individuals, never attempted to initiate arbitration, their liability depends upon National Transit's effort to initiate arbitration.

Central States; (2) written notice to the AAA; and (3) payment of the AAA filing fee. *Robbins v. B and B Lines, Inc.*, 830 F.2d 648, 651 (7th Cir.1987).[3]

The parties disagree about whether the PBGC regulations or the pension fund's rules apply, but it does not matter because, as the district court found, National Transit's attempt to initiate arbitration was untimely under either. The rules promulgated by Central States require written notice to Central States and the AAA. Since National Transit did not notify the AAA of its intent to arbitrate (or pay the filing fee) until September 9th, arbitration was not initiated until that date—three weeks too late.

Under the PBGC regulations, National Transit need only give notice to Central States, and National Transit did send a letter requesting arbitration to Central States on August 16th. But, the regulations require National Transit to establish that Central States *"received"* the notice within the applicable time period. It is undisputed that Central States did not receive the notice until the next day, August 17th. Under the express terms of the regulations, therefore, National Transit initiated arbitration one day *too late*.

In an effort to avoid the plain meaning of the term "received" in section 2641.2(c), the Ditellos ask us to equate the word "received" with the words "filed" or "served" as they are used elsewhere in the PBGC regulations. *See* 29 C.F.R. §§ 2641.5(c) & (g), 2641.7(b) and 2641.8(a). The regulations state that under some circumstances a document is "filed or served" on the date it was mailed. 29 C.F.R. § 2641.12(a). The

Ditellos argue that National Transit timely initiated arbitration because "received" is synonymous with "filed or served," and therefore Central States is deemed to have received the notice of arbitration on the date it was mailed, August 16th. This argument has no substance. The clear wording of the regulations show that the Labor Department regulators made the purposeful decision that whether a party has met some deadlines should be determined by the date of mailing or filing and others should be determined by the date a document is received. The fact that section 2641.2(c) uses the term "received" instead of "filed" or "served" conclusively shows that section 2641.2(c) requires actual receipt of the notice by Central States. The deadline for initiating arbitration was extended several times. Nevertheless, National Transit missed the deadline (albeit by one day) and thus failed to unilaterally initiate arbitration as required by 29 C.F.R. § 2641.2(c).

## IV.

For the foregoing reasons, the judgment of the district court is Affirmed.

---

**3.** The AAA rule on initiation of arbitration provides, in pertinent part:

> Arbitrations under these Rules are initiated in the following manner: (a)(i) The initiating party gives notice to the other party of its intention to arbitrate (Demand) which notice shall set forth a brief description of the dispute and shall include the amount involved, and (ii) files at any Regional Office of the AAA two (2) copies of said notice, *together with* the appropriate administrative fee as provided in the Administrative Fee Schedule.

(emphasis added). Although the pension fund rule itself does not require that the AAA fee be paid in order to successfully initiate arbitration, this court has stated that "[t]he Fund's rules, read in conjunction with the AAA arbitration rules, explicitly require a party initiating arbitration to pay the initial filing fee." *See B and B Lines,* 830 F.2d at 651. Thus, in *B and B Lines,* we held that "failure to pay the AAA filing fee rendered the initiation of arbitration untimely." *Id.*