**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a pension trust, et al., Plaintiffs,**

v.

**Robert MILLER and Ida Miller, his wife, jointly and severally, Defendants.**

**No. 93 C 612.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 18, 1994.

Terence George Craig, Central States Law Dept., Rosemont, IL, David A. Sawyer, Russell N. Luplow, David Machnacki, Gregory Robert Schermerhorn, Russell N. Luplow, P.C., Bloomfield Hills, MI, for plaintiffs.

Paul V. Esposito, Lewis, Overbeck & Furman, Daniel A. Kaufman, Michael, Best & Friedrich, Chicago, IL, Charles P. Stevens, Lindner and Marsack, S.C., Milwaukee, WI, Paul Jordan Cherner, Michael Best & Friedrich, Chicago, IL, Robert W. Mulcahy, Robert D. Rothacker, Paul D. Windsor, Michael Best & Friedrich, Milwaukee, WI, for defendants.

### MEMORANDUM OPINION AND ORDER

LEFKOW, United States Magistrate Judge:

Central States, Southeast and Southwest Areas Pension Fund (the "Fund") is a multiemployer pension plan within the meaning of sections 3(37) and 4001(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* and 1301(a)(3), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381 *et seq.* The Fund and its trustees have brought this action to enforce withdrawal liability against individuals, Robert Miller and Ida Miller, his wife (the "Millers"). Under the MPPAA, a multiemployer pension plan governed by ERISA is required to assess withdrawal liability against employers who withdraw from the plan. Here, the Fund alleges that because the Millers owned and leased certain property at the time that Miller Brothers Trucking Co., Inc. ("Miller Brothers") withdrew from the plan, they are responsible for Miller Brothers' withdrawal liability. Plaintiffs seek $231,305.98 in withdrawal liability plus interest, costs and attorneys' fees, less any amount already received on account of the withdrawal.

Cross motions for summary judgment are pending. The court has jurisdiction over this action pursuant to 29 U.S.C. §§ 1132(e),

1132(f) and 1451(c). Venue in this district is proper as the fund is administered in this district. 29 U.S.C. § 1451(d). The parties have consented to the disposition of this case by a United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c).

### SUMMARY JUDGMENT PROCEDURE

■ Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir.1993). Because plaintiffs and defendants have filed cross motions for summary judgment, the court must rule on each party's motion individually, determining in each case whether judgment may be entered in accordance with the standard set forth in Rule 56. *Wausau Insurance Co. v. Valspar Corp.*, 594 F.Supp. 269, 270 (N.D.Ill.1984). Treating plaintiffs' motion initially, the court will state the facts in a light most favorable to the defendants.

### FACTS

Miller Brothers was a Wisconsin corporation, owned and operated by the Millers. As of December, 1986, 100 percent of the outstanding stock of Miller Brothers was owned by the Millers. Prior to December, 1986, Miller Brothers made contributions to the Fund pursuant to a collective bargaining agreement with one or more locals of the International Brotherhood of Teamsters. In December, 1986, Miller Brothers was dissolved and ceased making contributions to the Fund.

The Fund determined that Miller Brothers effected a "complete withdrawal" from the pension fund as defined in section 4203 of ERISA, 29 U.S.C. § 1383. On June 30, 1987, in accordance with sections 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C. §§ 1382(2) and 1399(b)(1), the Fund sent Miller Brothers a letter of notice and demand for with-

drawal liability in the principal amount of $231,305.98. The letter advised Miller Brothers of its right to request that the Fund review Miller Brothers' withdrawal liability under section 4219(b)(2)(A) of ERISA, 29 U.S.C. § 1399(b)(2)(A), and to initiate arbitration under section 4221 of ERISA, 29 U.S.C. § 1401. Additionally, the letter notified Miller Brothers that the request for withdrawal liability "applies equally to all members of any controlled group of trades or businesses . . . of which [Miller Brothers] is a member." *See* 29 U.S.C. § 1301(b)(1). Answer at ¶ 18.

On August 28, 1987, Miller Brothers notified the Fund that it had no assets to satisfy their withdrawal liability and defaulted on the requested payments. Miller Brothers did not request arbitration of the withdrawal liability assessment. Pursuant to section 4221(b)(1) of ERISA, 29 U.S.C. § 1401(b)(1), the Fund subsequently brought an action in this court against Miller Brothers to collect the withdrawal liability.[1] The action was settled and, in exchange for the payment of $676.80, a release of all claims was given to Miller Brothers.

In July 1986, the Millers bought a house, as joint tenants, located at 3603 West Maple Street, Milwaukee, Wisconsin, for $39,019. The money used by the Millers to pay the down payment on the house originated in a joint bank account maintained by the Millers. The Millers bought the house in order to sell it to their daughter and her husband. In August 1986, Robert Miller contracted with Imperial Garages General Contractors to build a new garage at the house. In December, 1986, the Millers executed a mortgage and pledged the house to Republic Savings & Loan in return for a loan of $34,000.

The Millers' daughter and her husband did not move into the house because of marital difficulties, and the house remained vacant during the first two months after the Millers purchased it. In September 1986, Robert Miller entered into an agreement to rent the house to Steven Schutz ("Schutz") and Robin

---

1. *Central States, Southeast and Southwest Areas Pension Fund, et al. v. Miller Brothers Trucking* *Company,* No. 89 C 6190.

Morrison ("Morrison"). A lease was executed by Robert Miller as lessor to rent the property for six months starting in October, 1986, at a monthly rent of $450. The Millers assert that they never intended to make a profit from the house, and the only reason they rented it out was to minimize their losses until their daughter's marital problems subsided and she decided to buy the house. This was the Millers' first involvement in leasing real property to third parties.

Robert Miller handled all of the matters related to the rental of the house. Although Ida Miller admitted that she and her husband "rented" the house, she herself did not devote any time or effort to renting the house to Morrison and Schutz. She did not keep any records related to the house or perform any bookkeeping related to the house. She also did not keep track of or know how the expenses related to the house were paid.

Morrison and Schutz had no relationship with Miller Brothers. The rental of the house was not related in any way to the business of Miller Brothers, nor was the house ever used to benefit Miller Brothers. No money from any account of Miller Brothers was used to purchase or maintain the house. The Millers did not buy, sell or rent any property to Miller Brothers, nor did they have any type of lease with Miller Brothers.

Robert Miller rented the house to Morrison and Schutz on a continual basis through June of 1988. When it became apparent that their daughter's divorce was inevitable, the Millers decided to sell the house. In so doing, they both executed a listing contract with a real estate broker. On August 24, 1988, the house was sold for $50,500. During the time that they owned the house, the Millers never intended to acquire, nor did they acquire, another residential property.

On the federal income tax returns that the Millers filed for the tax years 1986 through 1988, the Millers deducted all expenses related to the rental of the house under Internal Revenue Code § 212(2) (ordinary and necessary expenses paid for the management, conservation, or maintenance of property held for the production of income). On the federal income tax return that the Millers filed for 1988, the Millers reported the gain on the sale of the house on Schedule D as a long-term capital gain.[2]

## DISCUSSION

The Fund, in support of its motion for summary judgment, argues that the Miller's ownership and leasing of the house at 3603 Maple, makes them members of a group of trades or businesses under common control with Miller Brothers. As such, the Fund contends that they are each individually liable to the Fund for the full amount of Miller Brothers' withdrawal liability.

In response to the Fund's motion, and in support of their own motion for summary judgment, the Millers do not challenge the Fund's right to assess withdrawal liability, and they do not challenge the amount of the liability assessed. They also concede that their leasing activity was under "common control" with Miller Brothers.[3] They argue, however, because the rental of the house was an activity totally unrelated to Miller Brothers it does not constitute a "trade or business" within the meaning of the MPPAA. They also contend that because the rental of the house was not continuous and regular and engaged in primarily for profit or in-

2. Additional facts are recited below with reference to particular issues.

3. ERISA and the MPPAA incorporate the Internal Revenue Code's "controlled group" standards for determining whether two related entities are deemed to be a single employer. Under these regulations, a "brother-sister" group is defined as a group of two or more organizations in which the same five or fewer people have a "controlling interest," and over which those same five or fewer people exercise "effective control." 26 C.F.R. § 1.414(c)–2(c)(1). A "con-

trolling interest" in a corporation is ownership of at least 80% of the voting shares. *Id.* at § 1.414(c)–2(b)(2)(i)(A). "Effective control" is demonstrated by ownership of at least 50% of the combined voting power of all the voting stock of a corporation. *Id.* at § 1.414(c)–2(c)(2)(i). It is undisputed that the Millers, at the time they leased the house, had 100 percent ownership of Miller Brothers. It is furthermore undisputed that they also had 100 percent ownership of the real estate enterprise.

come, it was not a "trade or business" within the meaning of the MPPAA.

## A. STATUTORY BACKGROUND

■ Congress enacted ERISA to "guarantee that 'if a worker has been promised a defined pension benefit upon retirement ... he will actually receive it.'" *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984), *quoting, Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). Under ERISA, as amended by the MPPAA, 29 U.S.C. §§ 1381–1461, an employer who withdraws from a multi-employer pension plan is subject to "withdrawal liability" equal to its proportionate share of the plan's "unfunded vested benefits." 29 U.S.C. § 1381(b)(1). Withdrawal liability is intended to ensure that "the financial burden of [the] employees' vested pension benefits will not be shifted to the other employers in the plan and, ultimately, to the Pension Benefit Guaranty Corporation, which insures such benefits." *See also Santa Fe Pacific Corp. v. Central States, Southeast and Southwest Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir.1994); *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir.1992).

To collect withdrawal liability under the MPPAA, a pension fund must determine the amount of withdrawal liability owed by a withdrawing employer, 29 U.S.C. §§ 1382, 1391, and send the employer a notice and demand for payment of that amount. 29 U.S.C. § 1399(b)(1). An employer who disagrees with the fund's determination of withdrawal liability may ask the fund to review its assessment, 29 U.S.C. § 1399(b)(2)(A), and if still dissatisfied, may initiate arbitration. 29 U.S.C. § 1401(a)(1). Arbitration concerning withdrawal liability is mandatory, *id.*, and if an employer fails to timely initiate

arbitration, the amount of liability assessed by the fund becomes due and owing, and the fund can sue to collect it. 29 U.S.C. § 1401(b)(1).

■ The statutory provision at issue is section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1).[4] This statute extends an employer's withdrawal liability to all "trades or businesses (whether or not incorporated) which are under common control" with the withdrawing employer. Under section 1301(b)(1), once liability of the principal employer is established, any enterprise that is (1) a "trade or business" and (2) under "common control" with the withdrawing employer is jointly and severally liable for the principal employer's withdrawal liability. *Central States, Southeast and Southwest Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 792 (7th Cir.1992); *Central States, Southeast and Southwest Areas Pension Fund v. Chatham Properties*, 929 F.2d 260, 264 (6th Cir.1991); *Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987).

"[Section] 1301(b)(1) was enacted to prevent employers from avoiding withdrawal liability by fractionalizing their operations." *Personnel*, 974 F.2d at 794; *See also Central States, Southeast and Southwest Areas Pension Fund v. Sztanyo Trust*, 693 F.Supp. 531, 537 (E.D.Mich.1988), *quoting, Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 955 (D.Mass.1979) ("§ 1301(b) utilizes control group liability to prevent businesses from 'juggl[ing] their activities to eviscerate the termination liability provisions of ERISA'"); *Central States Southeast and Southwest Areas Pension Fund v. Johnson*, 991 F.2d 387, 388 (7th Cir.1993) ("The main purpose of this rule is to prevent a business subject to an unfulfilled pension debt from 'fractionalizing its operations' or shifting as-

4. Section 1301(b)(1) provides:
   An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer.... For the purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be

treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26.

sets to related companies to avoid meeting its financial obligations to the plan.")

■ The issue is whether defendants' leasing activity constitutes a "trade or business" within the meaning of 29 U.S.C. § 1301(b)(1). If the Miller's real estate activities are properly termed a trade or business, they are liable for the withdrawal liability. *Personnel*, 974 F.2d at 794. When the determination of whether an enterprise is a "trade or business" under 29 U.S.C. § 1301(b)(1) is ultimately a question of characterization of a group of undisputed facts, it is properly resolved on summary judgement. *Slotky*, 956 F.2d at 1373–74.

## B. "TRADE OR BUSINESS"

ERISA does not contain a definition of the term "trade or business." Section 1301(b)(1) provides that the phrase "trades or businesses (whether or not incorporated) which are under common control" has the same meaning as that provided in the regulations promulgated under section 414(c) of the Internal Revenue Code. However, these IRS regulations do not define the term "trade or business"; they are concerned only with whether businesses are under "common control." Courts, therefore, have no guidance as to the meaning of the term "trade or business" within the language of the statute or its regulations. *Central States, Southeast and Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 889 (7th Cir.1992). "Courts examining the definition of 'trade or business' in § 1301(b)(1) have not adopted a particular definition, but have instead construed the phrase in accordance with Congress' purpose in enacting that section." *Personnel*, 974 F.2d at 794. *See also Ditello*, 974 F.2d at 890; *Board of Trustees v. Lafrenz*, 837 F.2d 892, 894 (9th Cir.1988); *Sztanyo Trust*,

693 F.Supp. at 536 (E.D.Mich.1988); *United Food and Commercial Workers Union v. Progressive Supermarkets*, 644 F.Supp. 633, 638 (D.N.J.1986). Federal courts have uniformly held that leasing property to a withdrawing employer is a "trade or business" under section 1301(b)(1). *Ditello*, 974 F.2d at 890; *Personnel*, 974 F.2d at 796; *Central States Southeast and Southwest Areas Pension Fund v. Koder*, 969 F.2d 451, 453–54 (7th Cir.1992); *Slotky*, 956 F.2d at 1374; *Lafrenz*, 837 F.2d at 895; *Central States Pension Fund v. Rogers*, 843 F.Supp. 1135, 1142 (E.D.Mich.1992); *Trustees of Amalgamated Insurance Fund v. Saltz*, 760 F.Supp. 55, 58 (S.D.N.Y.1991); *Sztanyo Trust*, 693 F.Supp. at 537; *United Food*, 644 F.Supp. at 639; *Pension Benefit Guaranty Corp. v. Center City Motors, Inc.*, 609 F.Supp. 409, 412 (S.D.Cal.1984).

### 1. Economic Relationship

■ It is undisputed that defendants in operating their real estate proprietorship did not at any time lease the property to the withdrawn corporation and that there is no economic relationship which Miller Brothers could have used to dissipate its assets and avoid withdrawal liability. The Millers maintain that this distinguishes them from the cases that have imposed withdrawal liability against owners of an unincorporated entity within a controlled group. They rely on *dicta* from *Ditello* indicating that the issue remains open. In *Ditello*, after finding that the Ditellos had engaged in a trade or business by leasing property to the withdrawing employer, the court continued, "[T]he more difficult question is whether leasing property to an unrelated third party is a 'trade or business' within the meaning of section 1301(b)(1)." *Ditello*, 974 F.2d at 890.[5] The court referred to its own language in *Slotky*,

---

5. The court cited cases holding that an economic relationship was necessary to establish withdrawal liability and cases holding that it was not necessary:

> *Compare Textile Workers Pension Fund v. Oltremare*, 764 F.Supp. 287, 289 (S.D.N.Y.1989) (section 1301(b) requires "a solid nexus between the real property and the other trades or businesses within the control group"), with *Lafrenz*, 837 F.2d at 895 ("section 1301(b)(1) does not require that commonly controlled businesses be economically related"); and *Lo-*

> *cal 478 Trucking and Allied Industries Pension Fund v. Jayne*, 778 F.Supp. 1289, 1305 (D.N.J. 1991) ("no showing of economic relationship is necessary under 29 U.S.C. § 1301(b)(1)") (citations omitted).

> *Compare also, ILGWU National Retirement Fund v. Minotola Industries, Inc.*, 1991 U.S. Dist. LEXIS 6147, *14, 1991 WL 79466, *4 (S.D.N.Y., May 3, 1991) ("However in a situation occupying a more shadowy area between 'trade or business' and mere investment or hobby, an economic nexus with the withdrawing company would be

956 F.2d at 1374, that " 'there is no requirement that the trades or business under common control be related[,]' " *id.*, but pointed out that there was in fact an economic relationship in that case. It concluded by stating, "[T]his circuit has never squarely faced the issue of whether businesses must be economically related to be considered members of a controlled group of trades or business under section 1301(b)(1), and it remains an open question." *Id.* Curiously, the court did not acknowledge *Personnel,* which had been decided by a different panel of the Seventh Circuit approximately three weeks earlier. In *Personnel,* the court imposed withdrawal liability on the basis that "§ 1301(b)(1) does not require an economic nexus other than common ownership as a prerequisite to withdrawal liability." *Personnel,* 974 F.2d at 793. Although the court additionally decided that in fact there had been an economic relationship in that case, *id.* at 793–94, its specific review of the district court's legal conclusion that proof of a relationship was required and its clear holding that such proof is not required make it difficult to distinguish the case at bar on the basis that no economic relationship existed between the real estate activity and Miller Brothers.

For this reason, it is concluded that plaintiff's inability to prove an economic relationship between the withdrawing employer and the real estate activity does not defeat their claim for withdrawal liability in spite of the cited language in *Ditello.*

### 2. Other Factors Related to "Trade or Business"

■ The next issue is whether the Millers' rental activity was a trade or business. As

relevant to a court's determination whether that operation constituted a 'trade or business' under ERISA"), with *O'Connor v. DeBolt Transfer, Inc.,* 737 F.Supp. 1430, 1445 (W.D.Pa.1990) (following *Lafrenz*), and *Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.,* 683 F.Supp. 986, 992 (E.D.Pa.1988). *See Also, Connors v. Incoal, Inc.,* 995 F.2d 245, 249–50 (D.C.Cir.1993) (reversed a district court finding that an economic nexus was necessary before an enterprise could qualify as a "trade or business" and ruled that whether an economic nexus exists between withdrawing employer and the enterprise is irrelevant.)

6. However, in *Ditello,* the Seventh Circuit declined to rely on *Groetzinger* because the term

discussed in *Ditello,* ERISA contains no definition of the term "trade or business" and the reference for assistance contained in section 1301(b)(1) to the Internal Revenue Code is not helpful. *Ditello,* 974 F.2d at 889. The terms are to be construed "in light of the purpose of the MPPAA." *Id.* at 890. "The purpose of the MPPAA ... 'is to prevent dissipation of assets required to secure vested pension benefits.' " *Id. quoting, Slotky,* 956 F.2d at 1374. *See also Personnel,* 974 F.2d at 794. But, as stated in *Incoal,* "Ultimately, the purpose of section 1301(b)(1)—'to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities,' *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.,* 830 F.2d 1009, 1013 (9th Cir.1987)— does not take a court very far, because the court must still decide if a particular 'operation' qualifies as a 'trade or business.' " *Incoal,* 995 F.2d at 251 n. 8. With that in mind, the court in *Incoal,* 995 F.2d at 250–51, and the Seventh Circuit in *Personnel,* 974 F.2d at 794, relied on *Commissioner v. Groetzinger,* 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987), in defining the characteristics of the term "trade or business." [6]

■ In *Groetzinger,* the Supreme Court discussed the meaning of the phrase "trade or business" as it appears in section 162(a) of the Internal Revenue Code, 26 U.S.C. § 162(a). Section 162(a) allows a taxpayer to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business.[7] The Court stated,

"trade or business" has different meanings " 'depending upon the [statutory] provision in which it is used.' " 974 F.2d at 889, *quoting, Groetzinger v. C.I.R.,* 771 F.2d 269, 271 & n. 4 (7th Cir.1985).

7. Groetzinger went to the horse and dog tracks six days a week for 48 weeks in the year 1978. He spent a substantial amount of time studying racing forms, programs, and other materials. He devoted from 60 to 80 hours each week to these gambling-related endeavors. He never placed bets on behalf of any other person, or sold tips, or collected commissions for placing bets, or functioned as a bookmaker. He gambled solely for his own account and had no other profes-

Of course, not every income-producing and profit-making endeavor constitutes a trade or business.... Congress "distinguished the broad range of income or profit producing activities from those satisfying the narrow category of trade or business." We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify.

*Id.* at 35, 107 S.Ct. at 987, *quoting, Whipple v. Commissioner,* 373 U.S. 193, 197, 83 S.Ct. 1168, 1171, 10 L.Ed.2d 288 (1963)). The determination of whether the primary purpose of an activity is to earn income or profit, thus making the activity a "trade or business," requires an examination of the facts in each case. *Groetzinger,* 480 U.S. at 36, 107 S.Ct. at 987. "A defendant's stated declaration that he or she did not intend to engage in a trade or business, without more, is hardly probative.... *Incoal,* 995 F.2d at 254. The court is to review the record evidence concerning the defendants' activities to determine if those activities were a trade or business under § 1301(b)(1). *Personnel,* 974 F.2d at 794. The tax treatment of the defendants' activities is relevant. *Id.* at 795. Whether the activities were regular and continuous and designed to produce income must also be considered. *Id.* at 796. In *Personnel,* defendant, for the relevant four years, filed a Schedule E ("Income from Supplemental Income") to his tax return rather than Schedule C ("Profit (or Loss) From Business or Profession"). He reported rents as income from which he deducted various expenses associated with leasing property, depreciation and interest/mortgage expenses. His Schedule E's typically declared a net loss

which he deducted from income, thus reducing his overall tax liability. When defendant sold the buildings he had leased, he declared his gain on Form 4797, "Gain or Loss from Sales or Exchanges of Assets Used in a Trade or Business," rather than as capital gains. The court stated that the fact that defendant treated his real estate activities as a business to allow him to claim deductions for his expenses was "strong evidence" that they constituted a trade or business under § 1301(b)(1). *Id.* at 795. The court looked to the characterization of the activities for tax purposes as relevant but not dispositive: "[Defendant's] use of Form 4797 and his use of Schedule E instead of Schedule C is not dispositive because he claimed all of the deductions that a similar real estate business would have claimed." *Id.*

The court in *Personnel* further found defendant's real estate activities "quite substantial and ... designed to produce income," even though defendant's leasing activity did not produce a net gain after deductions for depreciation, mortgage and other expenses. *Id.* at 796. The court noted that "he received constant benefits from his investments," (he satisfied his mortgages, increased his equity in the various properties, enjoyed the properties' appreciated value and reduced his overall tax obligation with deductions from income), and that the investments were "more than personal investments, such as holding shares of stock or bonds in publicly traded corporations." *Id.*

The Millers distinguish the facts of *Personnel* on the basis that the Millers did not deduct expenses as "trade or business expenses" but rather deducted these expenses as "Non-trade or Non-business expenses" under the Internal Revenue Code section 212(2).[8] Further, the Millers reported the gain from the sale of the property as a long term capital gain rather than on Form 4797

sion or type of employment. *Groetzinger,* 480 U.S. at 24, 107 S.Ct. at 981. The Supreme Court held that a full-time gambler who makes wagers solely for his own account was engaged in a "trade or business" within the meaning of § 162(a) of the Internal Revenue Code. *Id.* at 33, 107 S.Ct. at 986.

**8.** Section 212(2) allows an individual taxpayer who is not engaged in a trade or business to

deduct from gross income "all ordinary and necessary expenses paid or incurred during the taxable year ... for the management, conversion, or maintenance of property held for the production of income." Defendants rely on section 167, which permits a deduction for depreciation of assets, to emphasize the Code's distinction between property used in a trade or business from property held for the production of income.

as a sale of business property. The undisputed facts are that the Millers' deductions from rental income were reported, as in *Personnel*, on a Schedule E in 1986, 1987 and 1988. Due to the deductions of these expenses, the Millers, in two out of the three years, declared a net loss on their Schedule E, which loss they deducted from their income, thus reducing their overall tax liability similarly to the defendant in *Personnel*.[9] Thus, the only difference in tax treatment was the Millers' declaration of capital gains rather than, as in *Personnel*, a gain from the sale of an asset used in a trade or business.

This distinction has some force in light of the plaintiff's argument in *Personnel*, which the court noted, that had the defendant been merely making an investment "he could not have deducted expenses and *he would have declared his net gain or loss from disposition of the property on Schedule B—for capital gains—rather than on Form 4797.*" *Id.* at 795 (emphasis added). This court believes, however, that the distinction would not point to a different outcome from *Personnel* because the court in *Personnel* emphasized the fact that the defendant took deductions for expenses and did not discuss the argument concerning capital gains; and because the court indicated that the taxpayer's characterization of activities for tax purposes is not decisive. Therefore, this court concludes that the Millers' real estate activity cannot be distinguished from the activity at issue in *Personnel* on the basis that the Millers declared a capital gain on their tax return.

The next issue is whether the activity was "regular and continuous and designed to produce income." The Millers' activities were considerably less substantial than that reported in *Personnel* in that they had but one building for a two-year period, whereas in *Personnel* the defendant bought and sold more than a dozen properties over a period of four or more tax years. The small size of a leasing enterprise, however, will not defeat the "trade or business" determination. "'The rental of real estate is a trade or business if the taxpayer engages in regular or continuous activity in relation to the property ... even if the taxpayer rents only a single piece of real estate.'" *Personnel,* 974 F.2d at 795, *quoting, Alvary v. United States,* 302 F.2d 790, 796 (2d Cir.1962). *See also Lafrenz,* 837 F.2d at 895, *cited with approval in Personnel,* 974 F.2d at 796 (leasing of only two dump trucks by a husband and wife was a trade or business under § 1301(b)(1)); *Local 478 Trucking and Allied Industries Pension Fund v. Jayne,* 778 F.Supp. 1289, 1305 (D.N.J.1991) (partnership held liable as a trade or business under § 1301(b)(1) even though it owned and leased only one property). Still, the Millers argue that the activity was not regular and continuous, at least not as of the time withdrawal liability was assessed.

█ The Millers bought their property in 1986, and leased it from October, 1986 through June, 1988. They leased the house in order to minimize the losses that resulted from their daughter's inability to buy the house from them. They leased the house on a six-month lease, first receiving rent in October, 1986. The rental continued through and beyond July, 1987, when they received notice of withdrawal liability. They received rent of $450.00 on a monthly basis. Although their leasing activity did not produce a net gain after deductions of expenses, the Millers received a benefit from the reduction of their overall tax obligation. Although the Millers argue that ten months of rent is insufficient to establish regularity and continuity, *See* Defendants' Opening Memorandum at 16, they cite no authority in the ERISA context for this assertion. Principally, the Millers rely on provisions of Treasury regulations governing the trade or business question used by the Internal Revenue Service, *citing Allen v. Commissioner,* 72 T.C. 28, 34, 1979 WL 3723 (1979). Although the factors they cite may auger in the Millers' favor, the courts of appeals have not applied these factors in the ERISA context. The facts of this case support the conclusion that

---

**9.** Although the Millers did not declare a net loss on their Schedule E in 1986, they did offset their taxable loss on rental property against income received from other sources, thus decreasing their taxable income by $2807.00. In 1987, their taxable loss on rental property was $1526.41, and in 1988, their taxable loss on rental property was $277.13.

the Millers' activities with respect to the property were regular and continuous and designed to produce income.

Inasmuch as the Millers claimed deductions of expenses on their tax returns, they gained a benefit of, at least, reduction of their tax obligations, and the activity was regular and continuous and designed to produce income, the above-cited authorities lead to the conclusion that the Millers engaged in a trade or business under section 1301(b)(1).

## C. LIABILITY OF IDA MILLER

■ The final issue is the liability of Ida Miller. Defendants contend that even if the rental of the house constituted a trade or business, Ida Miller cannot be held personally liable for the`withdrawal liability because she was not a partner in the business. The Fund argues that the evidence shows that Ida Miller intended to be a *de facto* partner in the leasing enterprise and is therefore equally personally liable for the withdrawal liability.

Defendants rely on *Johnson*, 991 F.2d 387, to support their view that Ida Miller did not intend to be a partner with her husband and is thus not liable to plaintiffs. In *Johnson*, the court held that both spouses will be liable for a business's unmet pension obligations only when they intended to be partners in that enterprise. *Id.* at 391–92. *See also Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Rose Steinberg*, 32 F.3d 269 (7th Cir.1994); *Chicago Truck Drivers, Helpers & Warehouse Workers Pension Fund v. Slotky*, 9 F.3d 1251, 1253 (7th Cir.1993). In *Johnson*, Johnson leased to a controlled group entity a building and a semi-tractor of which he was the owner of record. *Id.* at 388. The district court held this leasing enterprise a trade or business under common control with the withdrawing corporation and, because Johnson owned the enterprise, he was personally liable for the obligation. *Id.* at 389. The Fund also sued Johnson's wife in order to make a claim against the marital home. Under Indiana law, the Fund had to establish

that the couple were jointly liable in order to reach this property. Thus her participation in her husband's business affairs was relevant. The district court found that the money used to purchase the building and semi-tractor came out of the couple's joint bank accounts, that the rental income produced by the leasing activities was deposited into joint accounts, and that the couple claimed deductions from their combined gross income on their joint federal tax return based on the leasing activities. *Id.* The court of appeals reversed summary judgment in favor of the wife on the basis that a genuine issue of fact concerning intent existed.

Neither party in this case asserts that an issue of fact exists; rather, each side believes the facts demonstrate that it is entitled to judgment—plaintiffs believe they show intent to form a partnership and defendants believe they show lack of intent. Defendants point to Ida Miller's lack of involvement in the rental activity. Ida Miller did not recall receiving or depositing rent checks or spending the money received from the rental. On the other hand, the Fund of evidence indicating that Ida Miller intended to form a partnership with her husband. The house was purchased with funds jointly owned by the Millers; Ida Miller was a record owner of the property; and losses from the business were taken as deductions from the couple's joint income tax returns.[10] Ida Miller signed a number of documents relating to the property, such as the listing contract, a settlement statement regarding the sale, an agreement to make certain modifications to the property, an "FHA Amendment," closing documents regarding the sale and mortgage documents.

Perhaps most instructive is the reference in *Johnson* to *Connors v. Ryan's Coal Co.*, 923 F.2d 1461 (11th Cir.1991), which held a wife liable based on her partnership interest in a cattle farm jointly owned with her husband. The wife had not executed a formal partnership agreement and she claimed little involvement in the cattle farm, but the court decided that a partnership existed on the

---

**10.** The evidence is inconclusive as to whether the rental income produced by the business went

into the Millers' joint accounts.

basis that the cattle farm operation paid property taxes and made mortgage payments on the farm land owned jointly by the couple, and the couple took those mortgage payments as deductions on their joint tax return. "The court acknowledged that co-ownership of property without more does not create a partnership. But it found that the facts in [that] case—especially the sharing of business profits and losses—supported a determination that [the couple] intended to be partners." *Johnson*, 991 F.2d at 392.

Here, Ida Miller admits that she shared her husband's intention to buy the house for her daughter's use, and she later shared in the profits and losses from the rental and sale after the original intention was derailed. The fact that Ida Miller did not involve herself in the leasing does not separate her from the *Connors* principle that the sharing of business profits and losses supports a determination of partnership, especially where there was in total little activity respecting the real estate. Here, of course, it is the additional fact that Ida Miller was an owner of record. The facts stated in a light favorable to the Millers point to the conclusion that Ida Miller intended to be a partner in the enterprise.

### CONCLUSION AND ORDER

In summary, the court concludes that there is no genuine issue of material fact that the withdrawal liability was properly assessed, that the Millers' leasing activity was under common control with the withdrawn corporation, that the leasing activity constituted a trade or business, and that Ida Miller was a partner in the enterprise. Under the decisions of the Court of Appeals for the Seventh Circuit, plaintiffs are entitled to judgment as a matter of law against Robert Miller and Ida Miller for the withdrawal liability.

For these reasons, plaintiffs' motion for summary judgment is granted and defendants' motion for summary judgment is denied. Plaintiffs are directed within 30 days to file a motion for entry of judgment setting out the various elements of their proposed judgments. The parties are directed to use their best efforts to agree on the amount of the judgment so as to avoid further delay in final disposition of this matter.